IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
5:15-CV-461-FL

| | | |
|---|---|---|
| DEBORAH GROCHALA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **MEMORANDUM** |
| | ) | **AND RECOMMENDATION** |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

In this action, plaintiff Deborah Grochala ("plaintiff" or, in context, "claimant") challenges the final decision of defendant Acting Commissioner of Social Security Carolyn W. Colvin ("Commissioner") denying her application for a period of disability and disability insurance benefits ("DIB") and supplemental security income ("SSI") on the grounds that she is not disabled.[1] The case is before the court on the parties' motions for judgment on the pleadings. (D.E. 29, 33). Both filed memoranda in support of their respective motions. (D.E. 30, 34). The motions were referred to the undersigned magistrate judge for a memorandum and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). (*See* 24 May 2016 Text Order). For the reasons set forth below, it will be recommended that the Commissioner's motion be granted, plaintiff's motion be denied, and the Commissioner's final decision be affirmed.

---

[1] The statutes and regulations applicable to disability determinations for DIB and SSI are in most respects the same. The provisions relating to DIB are found in 42 U.S.C. subch. II, §§ 401, *et seq.* and 20 C.F.R. pt. 404, and those relating to SSI in 42 U.S.C. subch. XVI, §§ 1381, *et seq.* and 20 C.F.R. pt. 416.

# BACKGROUND

## I.   CASE HISTORY

Plaintiff filed applications for DIB and SSI on 18 February 2014, alleging a disability onset date of 26 December 2013.  Transcript of Proceedings ("Tr.") 16.  The applications were denied initially and upon reconsideration, and a request for hearing was timely filed.  Tr. 16.  On 20 November 2014, a hearing was held before an administrative law judge ("ALJ"), at which plaintiff and a vocational expert testified.  Tr. 31-60.  The ALJ issued a decision denying plaintiff's claim on 8 January 2015.  Tr. 16-25.

Plaintiff timely requested review by the Appeals Council.  Tr. 7-11.  On 22 June 2015, the Appeals Council denied the request for review.  Tr. 2-6.  At that time, the decision of the ALJ became the final decision of the Commissioner.  20 C.F.R. §§ 404.981, 416.1481.  On 11 September 2015,[2] plaintiff commenced this proceeding for judicial review, pursuant to 42 U.S.C. §§ 405(g) (DIB) and 1383(c)(3) (SSI).  (*See In Forma Pauperis* Mot. (D.E. 1); Order Allowing Mot. (D.E. 5); Compl. (D.E. 6)).

## II.   STANDARDS FOR DISABILITY

The Social Security Act ("Act") defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see* 42 U.S.C. § 1382c(a)(3)(A); *Pass v. Chater*, 65 F.3d 1200, 1203 (4th Cir. 1995).  "An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot,

---

[2] On 14 October 2015, the Appeals Council extended, retroactively, the time for plaintiff to commence a civil proceeding to 15 September 2015, the date the complaint herein was filed.  Tr. 1.

considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2)(A); *see* 42 U.S.C. § 1382c(a)(3)(B).  The Act defines a physical or mental impairment as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

The disability regulations under the Act ("Regulations") provide a five-step analysis that the ALJ must follow when determining whether a claimant is disabled:

> To summarize, the ALJ asks at step one whether the claimant has been working; at step two, whether the claimant's medical impairments meet the regulations' severity and duration requirements; at step three, whether the medical impairments meet or equal an impairment listed in the regulations; at step four, whether the claimant can perform her past work given the limitations caused by her medical impairments; and at step five, whether the claimant can perform other work.

> The first four steps create a series of hurdles for claimants to meet. If the ALJ finds that the claimant has been working (step one) or that the claimant's medical impairments do not meet the severity and duration requirements of the regulations (step two), the process ends with a finding of "not disabled."  At step three, the ALJ either finds that the claimant is disabled because her impairments match a listed impairment or continues the analysis. The ALJ cannot deny benefits at this step.

> If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity ["RFC"], which is "the most" the claimant "can still do despite" physical and mental limitations that affect her ability to work. [20 C.F.R.] § 416.945(a)(1).[3] To make this assessment, the ALJ must "consider all of [the claimant's] medically determinable impairments of which [the ALJ is] aware," including those not labeled severe at step two. *Id.* § 416.945(a)(2).[4]

> The ALJ then moves on to step four, where the ALJ can find the claimant not disabled because she is able to perform her past work. Or, if the exertion required for the claimant's past work exceeds her [RFC], the ALJ goes on to step five.

---

[3] *See also* 20 C.F.R. § 404.1545(a)(1).

[4] *See also* 20 C.F.R. § 404.1545(a)(2).

At step five, the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that "exists in significant numbers in the national economy," considering the claimant's [RFC], age, education, and work experience. *Id.* §§ 416.920(a)(4)(v); 416.960(c)(2); 416.1429.[5] The Commissioner typically offers this evidence through the testimony of a vocational expert responding to a hypothetical that incorporates the claimant's limitations. If the Commissioner meets her burden, the ALJ finds the claimant not disabled and denies the application for benefits.

*Mascio v. Colvin*, 780 F.3d 632, 634-35 (4th Cir. 2015).

## III. FINDINGS OF THE ALJ

Plaintiff was 45 years old on the alleged onset date of disability and 46 years old on the date of the hearing. *See, e.g.*, Tr. 24 ¶ 7. The ALJ found that plaintiff has at least a high school education (Tr. 24 ¶ 8) and past relevant work as a cashier, deli slicer, and school cafeteria cook (Tr. 23-24 ¶ 6).

Applying the five-step analysis of 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4), the ALJ found at step one that plaintiff had not engaged in substantial gainful activity since the alleged onset date of disability. Tr. 18 ¶ 2. At step two, the ALJ found that plaintiff had the following medically determinable impairments that were severe within the meaning of the Regulations: cervical and lumbar degenerative disc disease and plantar fasciitis. Tr. 18 ¶ 3. At step three, the ALJ found that plaintiff did not have an impairment or combination of impairments that meets or medically equals any of the Listings. Tr. 18-19 ¶ 4.

The ALJ next determined that plaintiff had the RFC to perform sedentary work with limitations as follows:

The claimant can stand and walk for two hours and sit for six hours in an eight-hour workday, and lift, carry, push and pull ten pounds occasionally. The claimant could frequently stoop and crouch, and she would require a sit and stand option that would allow her to change from sitting to standing every 30 minutes.

---

[5] *See also* 20 C.F.R. §§ 404.1520(a)(4)(v), 404.1560(c)(2), 404.929.

Tr. 19 ¶ 5; *see* 20 C.F.R. §§ 404.1567(a) (defining sedentary work); 416.967(a) (same).[6]

Based on his determination of plaintiff's RFC, the ALJ found at step four that plaintiff was unable to perform her past relevant work.  Tr. 23 ¶ 6.  At step five, the ALJ accepted the testimony of the vocational expert and found that there were jobs in the national economy existing in significant numbers that plaintiff could perform, including jobs in the occupations of call out operator, order clerk, and surveillance system monitor.  Tr. 24 ¶ 10.  The ALJ therefore concluded that plaintiff was not disabled from the alleged onset date, 26 December 2013, through the date of his decision, 8 January 2015.  Tr. 25 ¶ 11.

## IV.  STANDARD OF REVIEW

Under 42 U.S.C. §§ 405(g) and 1383(c)(3), judicial review of the final decision of the Commissioner is limited to considering whether the Commissioner's decision is supported by substantial evidence in the record and whether the appropriate legal standards were applied.  *See Richardson v. Perales*, 402 U.S. 389, 390, 401 (1971); *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990).  Unless the court finds that the Commissioner's decision is not supported by substantial evidence or that the wrong legal standard was applied, the Commissioner's decision must be upheld.  *See Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986); *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Perales*, 402 U.S. at 401 (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  It is more than a scintilla of evidence, but somewhat less than a preponderance.  *Id.*

The court may not substitute its judgment for that of the Commissioner as long as the decision is supported by substantial evidence.  *Hunter v. Sullivan*, 993 F.2d 31, 34 (4th Cir.

---

[6] *See also Dictionary of Occupational Titles* (U.S. Dep't of Labor 4th ed. rev. 1991) ("DOT"), app. C § IV, def. of "S-Sedentary Work," 1991 WL 688702.  "Sedentary work" and the other terms for exertional level as used in the Regulations have the same meaning as in the DOT.  *See* 20 C.F.R. §§ 404.1567, 416.967.

1992) (per curiam). In addition, the court may not make findings of fact, revisit inconsistent evidence, or make determinations of credibility. *See Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996); *King v. Califano*, 599 F.2d 597, 599 (4th Cir. 1979). A Commissioner's decision based on substantial evidence must be affirmed, even if the reviewing court would have reached a different conclusion. *Blalock*, 483 F.2d at 775.

Before a court can determine whether a decision is supported by substantial evidence, it must ascertain whether the Commissioner has considered all relevant evidence and sufficiently explained the weight given to probative evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997). "Judicial review of an administrative decision is impossible without an adequate explanation of that decision by the administrator." *DeLoatche v. Heckler*, 715 F.2d 148, 150 (4th Cir. 1983).

## DISCUSSION

### I. OVERVIEW OF PLAINTIFF'S CONTENTIONS

Plaintiff contends that the ALJ's decision should be reversed and DIB and SSI awarded or, alternatively, that this case be remanded for a new hearing, on the grounds that, in determining her RFC, the ALJ erroneously assessed plaintiff's credibility. The court will address each of plaintiff's specific contentions after a review of applicable legal standards.

### II. APPLICABLE LEGAL STANDARDS

As previously noted, this court is not permitted to make credibility assessments, but must determine if the ALJ's credibility assessment is supported by substantial evidence. *Craig*, 76 F.3d at 589. The ALJ's assessment involves a two-step process. First, the ALJ must determine whether plaintiff's medically documented impairments could cause plaintiff's alleged symptoms. *Id*. at 594-95. Second, the ALJ must evaluate plaintiff's statements concerning those symptoms.

*Id.* 76 F.3d at 595. The ALJ's "'decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record.'" *Dean v. Barnhart*, 421 F. Supp. 2d 898, 906 (D.S.C. 2006) (quoting Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2 (2 July 1996)); *see also* 20 C.F.R. §§ 404.1529 (setting out factors in evaluation of a claimant's pain and other symptoms); 416.929 (same).

It is true, of course, that "[a] party seeking benefits need not provide objective medical evidence to corroborate his allegations of pain." *Hall v. Astrue*, No. 2:11-CV-22-D, 2012 WL 3727317, at *2 (E.D.N.C. 28 Aug. 2012). "However, an ALJ may discredit a party's allegations of pain to the extent the allegations are inconsistent with (1) objective medical evidence of the underlying impairment or (2) the pain reasonably expected to be caused by the underlying impairment." *Id.* (citing *Hines v. Barnhart*, 453 F.3d 559, 565 n.3 (4th Cir. 2006)); *Craig*, 76 F.3d at 595. In other words, an ALJ is not "obligated to accept the claimant's statements at face value; rather, the ALJ 'must make a finding on the credibility of the individual's statements based on a consideration of the entire case record.'" *Hyatt v. Colvin*, No. 7:14-CV-8-D, 2015 WL 789304, at *11 (E.D.N.C. 24 Feb. 2015) (quoting Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *2). Specifically, the Regulations require the ALJ to consider "all of the available evidence," which includes a claimant's history; the signs and laboratory findings (*i.e.*, objective medical evidence); statements about the effect of symptoms from the claimant, treating or nontreating sources, and other persons; and medical opinion evidence. 20 C.F.R. §§ 404.1529(c)(2), 416.929(c)(2).

### III.  ANALYSIS

#### A.  Contention that the ALJ Required Objective Evidence of Pain

Plaintiff first contends that the ALJ's credibility analysis was defective because he improperly required objective medical evidence in determining whether plaintiff's pain was disabling.

After a thorough description of plaintiff's testimony and a detailed review of the medical evidence, the ALJ determined at step one of his credibility analysis that plaintiff's "medically determinable impairments could reasonably be expected to cause [her] alleged symptoms."  Tr. 22 ¶ 5.  However, at the second step of the credibility assessment, the ALJ found that plaintiff's allegations were not fully credible.  Tr. 22 ¶ 5.  The ALJ provided specific reasons for his credibility determination as follows:

> The claimant does not have any significant anatomical structural deformities and *there was no evidence of ongoing nerve root compression, which might be expected based on the degree of pain alleged*.  The claimant had used over-the-counter medication for symptom relief.  The treatment regimen indicates that the claimant's symptoms are not as intractable as alleged.  In addition, the medical evidence does not reveal any evidence of a change in motor tone or bulk such as disuse atrophy, or other change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process.  These factors indicate that the claimant's allegations of functional restrictions were not fully credible.

> In terms of the claimant's alleged symptoms of cervical and lumbar degenerative disc disease and plantar fasciitis, the records revealed in February 2014, that the claimant's MRI showed mild degenerative disc disease.  Dr. Watson had stated that on her manual muscle testing examinations they were all within normal limits.  This physician had also noted in March 2014 that the claimant admitted that the pain in her arms and legs had improved after she started Lyrica.  She had acknowledged that her neck pain had improved since starting medication as well. The medical evidence in January 2014 noted that the claimant was in no acute distress and she walked without a limp, but she presented in a wheelchair to Dr. Yenni on January 21, 2014 with complaints of ongoing issues with her left foot. In February 2014, this physician had stated that the claimant was wearing regular shoes, she was able to walk without an assistive device and she took no medication for her alleged foot pain.

8

She was able to care for her personal needs and activities of daily living independently. She related that she was able to perform duties sitting down, such as washing dishes and doing laundry. The claimant had also testified that she helped to care for her four and a half year old grandchild that had special needs. Although the claimant complained of problems with her legs, back and feet, she had testified that she stopped working at Wal-Mart to care for her granddaughter with special needs. She had also testified that she was able to drive. These factors indicate that the claimant's allegations of functional restrictions were not fully credible.

Tr. 22-23 ¶ 5 (emphasis added).

Plaintiff challenges the ALJ's finding that "there was no evidence of ongoing nerve root compression, which might be expected based on the degree of pain alleged." Tr. 22 ¶ 5. Plaintiff asserts that in making this finding, "the ALJ placed great stress upon his personal opinion that the MRI did not provide evidence of pathology sufficiently severe to justify [plaintiff's] allegations of pain." (Pl.'s Mem. 16). She argues that because she met the showing at step one of the credibility analysis, she was entitled "to rely exclusively on subjective evidence to prove that her pain was so severe that she could not work an eight-hour day." *Id.* (internal footnote omitted)). But as previously discussed, an ALJ may properly consider whether objective medical evidence, along with the other evidence of record, is inconsistent with plaintiff's subjective complaints of pain. *See Hall v. Astrue*, 2012 WL 3727317, at *2.

Contrary to plaintiff's assertion, the ALJ's statement regarding lack of evidence of ongoing nerve root compression does not indicate that he required such evidence to substantiate plaintiff's allegations of pain. Rather, as the ALJ's detailed credibility analysis demonstrates, he determined that plaintiff's allegations were inconsistent with not only this piece of objective medical evidence, but also with the other relevant evidence of record he described, including the medications and other treatments she used to address her pain, her statements to her medical providers, and her testimony regarding how the pain affected her pattern of daily living.

Accordingly, the court concludes that the ALJ did not err in assessing plaintiff's credibility in his consideration of objective medical evidence.

### B.     Contention that the ALJ Erroneously Evaluated Certain MRI Findings

Plaintiff further challenges the ALJ's finding regarding the lack of "ongoing nerve root compression" (Tr. 22 ¶ 5) on the grounds that that it constitutes an improper exercise of medical expertise outside the scope of the ALJ's authority and is contrary to the medical evidence demonstrating that she had ongoing post-operative deterioration of her spinal condition.

As an initial matter, the ALJ expressly acknowledged that imaging studies of plaintiff's lumbar spine showed post-surgical changes.  Specifically, he noted that plaintiff's 7 January 2013 MRI indicated "degenerative and postsurgical changes" to her lumbar spine.  Tr. 20 ¶ 5 (referencing Tr. 305).  However, with respect to nerve root compression, a plain reading of plaintiff's two post-surgical lumbar MRIs supports the ALJ's finding that post-surgical improvement of compression of nerve roots at the L5-S1 level had been maintained.

A pre-surgery MRI on 3 April 2008 indicated a "[m]oderate central and right HNP [herniated nucleus pulposus[7]] *compressing the nerve roots*" at the L5-S1 level.  Tr. 495 (emphasis added).  However, approximately four and a half months after her August 2012 lumbar fusion surgery, a 7 January 2013 MRI showed "mild focal disc bulge with the annulus fibrosis *contacting the right S1 nerve root without significant displacement*."  Tr. 305 (emphasis added).  A subsequent MRI on 31 December 2013, which was compared to the 7 January 2013 MRI, indicated "postoperative sequela at left laminotomy with persistent right paracentral focal disc protrusion and annular high signal, *just contacting the transiting right S1 nerve root*," but

---

[7] "Herniated nucleus pulposus" refers to "a condition in which part or all of the soft, gelatinous central portion of an intervertebral disk is forced through a weakened part of the disk, resulting in back pain and nerve root irritation." *See* entry for "herniated nucleus pulposus," MedlinePlus Dictionary, https://medlineplus.gov/ency/imagepages/ 9700.htm (last visited 3 Aug. 2016).

also that "[o]verall mass effect is not significantly changed. Neural foramina widely patent. *No new enhancing abnormality about this region*." Tr. 297 (emphasis added). Thus, while post-surgery imaging showed evidence of *contact* with the S1 nerve root, it did not continue to show *compression* of nerve roots at the L5-S1 level as seen on 3 April 2008. Because the ALJ's finding merely reflects the findings in the MRI reports, plaintiff's argument that he inappropriately exercised medical judgment is without merit.

### C.     Contention that the ALJ Erroneously Evaluated the Discontinuation of Pain Medications

Plaintiff next challenges the ALJ's finding that, on 11 January 2013, plaintiff's treating orthopedic surgeon Cary S. Idler, M.D. "discontinued the claimant's pain medication . . . except for over-the-counter medication." Tr. 20 ¶ 5. She contends that the ALJ's finding incorrectly suggests that prescribed medications were discontinued due to lack of pain. She asserts that, instead, the basis for discontinuation of her medications was Dr. Idler's "concern for the dangers of chronic narcotic pain medications." (Pl.'s Mem. 19). The court disagrees.

In his 11 January 2013 treatment record, Dr. Idler stated the following:

> The patient is about 3 months post op from [a] lumbar disce[c]tomy and has been doing fairly well. We are going to discontinue with the bracing as well as lifting, bending and twisting restrictions. *We will discontinue with pain medication except for OTC medications as needed. If occasional pain medications are needed, we will continue to taper off the narcotics as soon as possible. A chronic pain management consult will be warranted if continued narcotic pain medications are needed except for occasional use.* We will see [her] back in 3 months for repeat Xray. We will also continue with physical therapy if needed.

Tr. 304 (emphasis added). Consistent with the ALJ's findings, Dr. Idler's notes plainly indicate that he discontinued not only prescription pain medications, but also several physical restrictions because plaintiff was "doing fairly well" post-surgery. Tr. 304. In addition, the only medication that Dr. Idler prescribed for plaintiff at this visit was a course of steroids. Tr. 304. Moreover, it

is clear from Dr. Idler's notes that his recommendation for tapering off of narcotic medications and receiving chronic pain management services was contingent upon plaintiff's need for narcotic pain medications in the future. Accordingly, plaintiff's argument is without merit.

### D. Contention that the ALJ Ignored Certain Medical Evidence

Plaintiff asserts that the ALJ also committed reversible error on the grounds that he "ignored" certain medical evidence relating to her lumbar impairment that is inconsistent with his determination of the severity of her back pain. (Pl.'s Mem. 20).

First, she challenges the ALJ's findings regarding her emergency room treatment for back pain on 28 December 2013 after slipping on ice and falling down three steps. *See generally* Tr. 266-74. With respect to this incident, the ALJ found as follows:

> Emergency room records showed that the claimant was treated at WakeMed North Healthplex on December 28, 2013, with complaints of back pain. The claimant reported falling down three steps two days prior after slipping on ice. She alleged that she felt a sharp pain in her lower back after pushing a bucket. Jonas [McAlarney[8]], M.D. noted on examination that the claimant[']s back appeared normal with no CVA [*i.e.*, costovertebral angle[9]] tenderness and she had normal range of motion in all joints. Dr. [McAlarney] stated that the claimant moved all extremities equally. He noted that she had unilateral pars defect at L5. She reported that she had back surgery a year ago. (Exhibit 2F)

Tr. 20 ¶ 5.

Plaintiff argues that the ALJ's discussion improperly suggests that there were little or no abnormal findings on 28 December 2013. However, the ALJ's discussion is simply a description of the contents of the record, and an accurate one at that. Consistent with the ALJ's findings, the records indicate that upon examination of her back, Dr. McAlarney found that plaintiff complained of "tenderness in lower lumbar back with palpati[o]n, back appears normal and no

---

[8] The ALJ incorrectly spelled Dr. McAlarney's name as "McAlarney."

[9] The "costovertebral angle" is "the acute angle formed on either side between the twelfth rib and the vertebral column." *Stedman's Medical Dictionary*, entry for "costovertebral angle," Westlaw at STEDMANS 41340 (last updated Nov. 2014).

step offs.,[10] there is no CVA tenderness." Tr. 267. Dr. McAlarney further noted that an x-ray of plaintiff's lumbar spine indicated a "unilateral pars defect at L5, she tells me she had surgery 1 yr ago and 'has screws at L4' which are not visible on xray." Tr. 267. Consistent with Dr. McAlarney's treatment notes, the radiology report stated, "Findings suggesting a pars defect on the patient's right L5-S1. The age of this abnormality is not clarified by plain film assessment. MRI should be considered to confirm diagnosis and determine the age of the abnormality if present." Tr. 268.

Plaintiff further asserts that the ALJ's discussion of the findings in the 28 December 2013 records without discussion of the results of an MRI conducted three days later, on 31 December 2013, indicates that he improperly considered only the evidence that supported his conclusions. Again, the court disagrees.

While plaintiff is correct that the ALJ did not specifically discuss the results of the 31 December 2013 MRI, an ALJ is not required to discuss every piece of evidence. *See Smith v. Colvin*, No. 4:14-CV-12-FL, 2015 WL 1249875, at *1 (E.D.N.C. 20 Jan. 2015) (quoting *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014)); *Doyle v. Colvin*, No. 7:12-CV-326-FL, 2014 WL 269027, at *10 (E.D.N.C.), *mem. & recomm. adopted by* 2014 WL 269027, at *1 (23 Jan. 2014). However, the ALJ did discuss Dr. Idler's 31 December 2013 treatment notes, in which Dr. Idler described the results of the MRI in detail. The ALJ discussed this office visit as follows:

> Dr. Idler stated that the claimant complained of standing and walking for long periods of time. He noted that the claimant had bilateral radiating leg pain and severe low back pain. This physician indicated that she reported falling the week prior.

---

[10] A "step off" is a misalignment of vertebra that can be palpated on physical examination of the spine. University of Southern California Spine Center website, http://www.uscspine.com/conditions/spine-fractures.cfm (last visited 3 Aug. 2016).

Tr. 21 ¶ 5 (referencing Tr. 294).[11]  Plaintiff saw Dr. Idler on that day, presumably as suggested in

the 28 December 2013 emergency department discharge plan.  *See* Tr. 267 (stating that "patient

was discharged from the Emergency Department in good condition to follow up with Your

physician in 2-3 days" (capitalization original)).  As recommended in the 28 December 2013

radiology report, Dr. Idler referred plaintiff for an MRI, which was conducted the day of the 31

October 2013 visit.  Tr. 295.  The record further indicates that Dr. Idler reviewed the results of

the MRI with plaintiff and described the MRI as showing "L4-S1 left [hemilaminectomy].  No

new herniated nucleus pulposus.  No significant spinal stenosis.  Possible L5 pars defects.  There

is a L5-S1 slightly rt paracentral annular tear and broad bulge, but without spinal stenosis."  Tr.

295.

Plaintiff has failed to explain how these MRI findings demonstrate that she is disabled,

and the records indicate to the contrary.  For example, after review of the MRI results, Dr. Idler

further remarked, "[w]e will watch this and try steroids.  If no better in a week or [two] will try

some ESIs [epidural steroid injections]."  Tr. 295.  There is no indication in the record that

plaintiff reported any worsening of her symptoms within the following two weeks.  In fact, she

did not see Dr. Idler again until 25 February 2014.  *See* Tr. 292.  While plaintiff continued to

complain of back pain on that date, she also raised a new complaint of neck, shoulder, and arm

pain.  Tr. 292.  Dr. Idler's plan for plaintiff on that date did not include any new or different

treatment for back pain, but only an order for a cervical MRI to assess the cause of plaintiff's

neck pain.  Tr. 293.  Moreover, in her next visit to Dr. Idler, on 4 March 2014, her primary

complaint was of continuing neck and shoulder pain.  Tr. 289.  With respect to her back pain,

plaintiff reported only that she "[s]till has a little on and off left leg discomfort from time to

---

[11] The court notes that the ALJ failed to specifically identify in his decision the date of the treatment record he was
discussing.  However, the 31 December 2013 treatment record is the only record in which this information appears,
and it was clear that the ALJ was discussing Exhibit 3F, which includes this treatment record.

time."[12] Tr. 289. Thereafter, the record contains no evidence that plaintiff complained of or was treated for back pain. Thus, contrary to plaintiff's assertion that the 31 December 2013 MRI results were inconsistent with the ALJ's disability determination, Dr. Idler's response to them and the lack of continuing complaints of back pain by plaintiff further support his determination that plaintiff's back pain was not disabling.

Plaintiff also contends that the ALJ inappropriately downplayed the results of an earlier MRI on 7 January 2013. Regarding that MRI, the ALJ found as follows:

> She underwent a[n] MRI of her lumbar spine on January 7, 2013, due to low back pain with radiculopathy. Jerry L. Watson, M.D. noted that the claimant's Ll-L4 was normal. The claimant's L5-S1 was described as having mild focal disc bulge. Dr. Watson['s] impression was degenerative and postsurgical changes.

Tr. 20 ¶ 5. Plaintiff contends that the ALJ failed to fully describe the findings in the MRI report with respect to the L5-S1 segment, which follow in their entirety: "There is mild focal disc bulge with the annulus fibrosis contacting the right S1 nerve root without significant displacement. Epidural fibrosis evident along the right posterolateral epidural space." Tr. 305. While the ALJ did not recite these findings verbatim, as previously discussed, he was not required to do so. *See Smith*, 2015 WL 1249875, at *1. Moreover, plaintiff has failed to provide any explanation or otherwise demonstrate that the findings not described by the ALJ would show that plaintiff is disabled.

For the foregoing reasons, plaintiff's argument that the ALJ failed to adequately discuss or consider certain MRI evidence is without merit.

---

[12] Notably, she also reported that she walked one to two times a week for exercise. Tr. 289.

**E.     Contention that the ALJ Inadequately Explained His Credibility Determination**

Plaintiff next contends that the ALJ failed to provide a valid explanation of his assessment of her credibility.  She challenges the following discussion by the ALJ of her 9 January 2014 surgical treatment (Tr. 320-21) for plantar fasciitis:

> The medical evidence in January 2014 noted that the claimant was in no acute distress and she walked without a limp, but she presented in a wheelchair to Dr. Yenni on January 21, 2014 with complaints of ongoing issues with her left foot. In February 2014, this physician had stated that the claimant was wearing regular shoes, she was able to walk without an assistive device and she took no medication for her alleged foot pain.

Tr. 23 ¶ 5.  Apparently, plaintiff contends that by noting that she walked without a limp during a post-operative follow-up office visit on 15 January 2014[13] (referencing Tr. 318), but then was in a wheelchair when seen less than a week later on 21 January 2014 (referencing Tr. 316), the ALJ was attempting to highlight "a seeming inconsistency, or even fakery at worst, and another instance of [plaintiff]'s lack of credibility" (Pl.'s Mem. 22).  She argues that the ALJ failed to acknowledge a simple explanation for the inconsistency, which is that she was experiencing some post-operative complications involving abnormal sensations in her foot.

The court does not interpret the ALJ's comments, as plaintiff suggests, as intending to highlight an inconsistency, but rather as simply summarizing the course of plaintiff's post-operative recovery.  Notwithstanding the ALJ's description of the two January 2014 post-operative visits, the most relevant portion of his discussion is one that plaintiff does not challenge:  that by 18 February 2014, plaintiff's recovery appeared to be progressing well.  *See* Tr. 309 ("[Plaintiff] is in for followup on her left plantar fascia release.  She is in regular shoes walking without assistive devices and she is not taking any medicines for her foot."); Tr. 310 (noting "[l]eft plantar fascia release with good resolution of pain").

---

[13] As indicated, the ALJ did not give the full date of this office visit in his decision.

**F.    Contention that the ALJ Failed to Question Plaintiff regarding Her Activities of Daily Living**

Plaintiff further asserts that the ALJ improperly assessed her testimony about her daily activities by failing to consider whether they were "'structured so as to minimize symptoms to a tolerable level or eliminate them entirely, avoiding physical or mental stressors that would exacerbate the symptoms.'" (Pl.'s Mem. 23 (quoting Soc. Sec. Ruling 96-7p, 1996 WL 374186, at *8)). She contends that she "offered many instances of structuring daily activities so as to permit her to perform some domestic duties" such as having to sit down periodically when performing tasks that required standing and having to perform tasks in increments because she could only concentrate on a task for about 20 minutes. (Pl.'s Mem. 23). She further references portions of her testimony, including that "she tries to go to church, but that some Sundays she experiences too much pain to go," she has "2 good days out of a week of 7 days," and that "on a bad day she will lay down [making it] very difficult . . . to take care of her 4-1/2 year-old." (Pl.'s Mem. 23). She also takes issue with the ALJ's reliance on her testimony that she could drive as one of the factors undermining her credibility (*see* Tr. 23 ¶ 5) because he failed to acknowledge her further qualification that that she "tried not to [drive] that much because I'm sitting too long to drive." Tr. 47.

Plaintiff argues that the error in the ALJ's credibility analysis lies in his drawing adverse credibility inferences from the evidence of her minimal daily activities without seeking an explanation from her about such evidence. Plaintiff's argument is ill founded.

Much of the qualifying information that she claims the ALJ failed to consider was in her testimony at the hearing, obviating any need for the ALJ to question her further about it. For example, regarding the number of good days she has in a week, her attorney elicited detailed information from her on this subject as follows:

| Q | Do you have good days and bad days? |
|---|---|
| A | Yes, I do. |
| Q | How many good days in a week do you have versus bad days? |
| A | Probably two. |
| Q | Two good? |
| A | Uh-huh. |
| Q | And then five bad? |
| A | Yeah. |
| Q | Okay. And during a bad day, what can you do? |
| A | Well, I just take my meds and my husband, if he's home, I'll just lay down. If I really, if I really need to lay down, I'll lay down. But when he's not home, because I have the 4-1/2-year-old, it gets kind of [tricky] because I have to do certain things with her and sometimes I can't do it. |
| Q | Right. Okay. All right. So, do you think you could get out — on the bad days, do you think you could get out and get to a job? |
| A | No. |
| Q | Okay. How many days do you think you would miss in a week or a month, workdays? |
| A | Before I quit Harris Teeter's, there was a lot of call-outs, like three in a week where I got spoken to and I told them why I was out. I actually gave them a doctor's note on why I was out. |

Tr. 48-49.

Regarding her church attendance plaintiff testified as follows:

| Q | Okay. How about church, do you go to church? |
|---|---|
| A | Yes, I try to go to church every Sunday. |
| Q | Okay. What do you mean try? |
| A | Well, there is sometimes where I don't go. |
| Q | Okay. And why is that? |
| A | It just depends on my pain on those days. |
| Q | Okay. |
| A | Because there you have to sit, stand, sit — |
| Q | Right. |
| A | — stand, sit[,] stand. |

Tr. 48. Plaintiff has failed to explain what additional explanation the ALJ was obligated to seek regarding the effects of her impairments on her daily activities.

Further, the fact that the ALJ did not discuss all of plaintiff's testimony in his decision does not mean that he did not consider it. The ALJ recounted in detail plaintiff's hearing testimony as to how her impairments affect her daily life, including some of the very testimony

plaintiff references in her argument. *See*, *e.g.*, Tr. 20 ¶ 5 (ALJ describing plaintiff's testimony about church by stating that "she tried to attend church every Sunday if she was not experiencing pain"). In his discussion of his credibility assessment, he also acknowledged her testimony that "she helped to care for her four and a half year old grandchild that had special needs." Tr. 23 ¶ 5 (referencing Tr. 39, 54-55).

The court concludes that ALJ's decision substantiates that he properly considered plaintiff's testimony regarding her daily activities in assessing her credibility and that her argument is, essentially, an invitation for the court to reweigh this evidence. Under the applicable standard of review, the court is not permitted to do so. *See Craig*, 76 F.3d at 589. The court accordingly rejects plaintiff's challenge to the ALJ's handling of her activities of daily living.

### G.     Contention that the ALJ Erroneously Relied on Boilerplate Language

Finally, plaintiff asserts that the ALJ improperly explained his credibility determination using boilerplate language rather than providing a rationale based on the evidence. Plaintiff's argument is wholly without merit. As set out above, following a thorough review of the medical evidence, the ALJ provided a detailed discussion of his credibility determination, and, despite plaintiff's assertions, it includes appropriate references to the supporting evidence.

One example of purportedly unexplained boilerplate used by the ALJ is his statement that plaintiff's "treatment regimen indicates that [her] symptoms are not as intractable as alleged" (Tr. 22 ¶ 5) constitutes one example of such unexplained boilerplate. Plaintiff fails to acknowledge, however, that in the immediately preceding sentence, the ALJ explained that plaintiff "had used over-the-counter medication for symptom relief." Tr. 22 ¶ 5. This remark relates to his earlier discussion of the evidence in which he noted, as previously discussed, that

three months post-surgery, plaintiff's physician "discontinued [her] pain medication . . . except for over-the-counter medication." Tr. 20 ¶ 5.

The plaintiff also challenges the ALJ's statement that the record "does not reveal any evidence of a change in motor tone or bulk such as disuse atrophy, or other change in body habitus or constitutional appearance such as weight loss, which might be expected in a person whose activities are markedly restricted due to a debilitating disease process." Tr. 22 ¶ 5. Again, this statement can be fairly read as a reference to the ALJ's previous discussion of the evidence. For example, the ALJ noted that on 1 March 2013, plaintiff was found to have "strength and tone in her upper extremities [of] five out of five and she had five out of five-grip strength in both hands." Tr. 21 ¶ 5. He also noted specifically that plaintiff's weight was 163 pounds on 12 March 2014 and 164 pounds on 6 July 2014, almost four months later (Tr. 22 ¶ 5), thereby supporting his finding of no weight loss.

The court concludes that the statements plaintiff challenges constitute a reasoned discussion of the evidence supporting the ALJ's credibility determination. It accordingly rejects this final challenge to the ALJ's decision.

## CONCLUSION

For the foregoing reasons, IT IS RECOMMENDED that the Commissioner's motion (D.E. 33) for judgment on the pleadings be GRANTED, plaintiff's motion (D.E. 29) for judgment on the pleadings be DENIED, and the Commissioner's final decision be AFFIRMED.

IT IS DIRECTED that a copy of this Memorandum and Recommendation be served on each of the parties or, if represented, their counsel. Each party shall have until 17 August 2016 to file written objections to the Memorandum and Recommendation. The presiding district judge must conduct her own review (that is, make a de novo determination) of those portions of the

Memorandum and Recommendation to which objection is properly made and may accept, reject, or modify the determinations in the Memorandum and Recommendation; receive further evidence; or return the matter to the magistrate judge with instructions. *See, e.g.*, 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(3); Local Civ. R. 1.1 (permitting modification of deadlines specified in local rules), 72.4(b), E.D.N.C.

**If a party does not file written objections to the Memorandum and Recommendation by the foregoing deadline, the party will be giving up the right to review of the Memorandum and Recommendation by the presiding district judge as described above, and the presiding district judge may enter an order or judgment based on the Memorandum and Recommendation without such review. In addition, the party's failure to file written objections by the foregoing deadline will bar the party from appealing to the Court of Appeals from an order or judgment of the presiding district judge based on the Memorandum and Recommendation.** *See Wright v. Collins***, 766 F.2d 841, 846-47 (4th Cir. 1985).**

Any response to objections shall be filed within 14 days after filing of the objections.

This 3rd day of August 2016.

James E. Gates
United States Magistrate Judge